# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00188-CV

**Rudolph "Rudy" A. Schlais, Jr., Individually and as Legal Representative for Cyrill Eltschinger, Reiko Yuan, Laura Ning, Sean Zhao, Charles Zhang, and Ray Yang, Appellants**

**v.**

**Valores Corporativos Softtek, S.A. de C.V., Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. D-1-GN-08-003878, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The appellants are former shareholders in a foreign holding company that was acquired by another foreign holding company, Valores Corporativos Softtek, S.A. de C.V. ("VCS"). The former shareholders, all of whom are non-Texas residents, sued VCS in Texas for allegedly breaching the payment provisions in the acquisition agreement. VCS filed a special appearance contesting personal jurisdiction, which the trial court sustained after determining that VCS's contacts with Texas were insufficient to confer either specific or general jurisdiction. We will affirm.

**FACTUAL AND PROCEDURAL BACKGROUND[1]**

VCS, a Mexico corporation, agreed to purchase all of the outstanding shares of stock of Information Technology United Corporation B.V.I. ("ITU"), a British Virgin Islands corporation with a China-based wholly-owned subsidiary that provided information technology outsourcing services ("ITU Hong Kong"). To consummate the transaction, VCS executed a share purchase agreement ("SPA") with ITU's shareholders—Rudolph A. Schlais, Jr., Cyrill Eltschinger, Reiko Yuan, Laura Ning, Sean Zhao, Charles Zhang, and Ray Yang (collectively "the ITU Shareholders"). The purchase transaction was closed in Monterrey, Nuevo Leon, Mexico. The SPA specified a total purchase price of approximately $8.9 million[2] to be paid in the following manner: (1) $2.5 million to be paid at the time of closing in cash and in shares of stock in VCS's parent company, Infosoft, S.A. de C.V. ("Infosoft"); (2) $1.25 million in Infosoft stock to be paid on the first anniversary of the closing date; (3) $1.35 million in Infosoft stock to be paid on the second anniversary of the closing date; and (4) two performance-based cash payments calculated by applying specified multipliers to ITU's 2007 and 2008 consolidated EBITDA (earnings before interest, taxes, depreciation, and amortization) results.[3]

---

[1] The facts recited in this section are undisputed and are taken from the pleadings, the evidence admitted at the special-appearance hearing, and the trial court's undisputed fact findings.

[2] "The aggregate purchase price (the 'Purchase Price') for buying all outstanding shares of [ITU] . . . shall be $8,900,000.00 (eight million nine hundred thousand United States Dollars)."

[3] Section 4.02 of the SPA outlined the "Structure and Payment of the Purchase Price." Subsections (4) and (5) described the performance payout as follows:

> (4) In consideration for the Purchase Price, the Buyer will pay the Seller a performance payout amount equivalent to the result of multiplying 2.75 times the Corporations [sic] 2007 consolidated EBITDA according to U.S. GAAP.

The precise date the performance-based payments were due is not specified in the SPA, but the agreement states that "the final Purchase Price may increase or decrease" based on ITU's "real 2007 and 2008 consolidated EBITDA results." The performance-based payments were also expressly made contingent on the continued employment of one of the plaintiffs, Eltschinger, and other unspecified "key management" employees until the entire purchase price had been paid. The SPA did not identify a particular location for remitting the purchase-price payments and instead required that the payments be made as instructed by the ITU Shareholders. At the close of the transaction, ITU and its China-based subsidiary became wholly-owned subsidiaries of VCS and were collectively referred to by VCS and its subsidiaries as "Softek China."[4]

When the first anniversary of the closing date arrived, VCS failed to make the requisite anniversary payment. VCS contended that no performance-based payment was owed due to ITU's negative EBITDA results and that the terms of the performance-based payment provisions authorized VCS to apply the relevant multipliers to *negative* EBITDA results and offset that amount against the required anniversary payment amounts, essentially creating a "negative bonus." Although the ITU Shareholders did not dispute that VCS owed no performance-based payment under subsections 4.02(4) and 4.02(5) of the SPA, the ITU Shareholders disagreed with VCS's interpretation of the alleged interplay between the SPA's performance-based-payment provisions and

(5) The Buyer will pay the seller a performance payout amount equivalent to the result of multiplying 1.50 times the Corporations [sic] 2008 consolidated EBITDA according to U.S. GAAP.

[4] It is unclear what the formal legal names of these entities became after they were acquired by VCS.

3

the anniversary-payment provisions. Because the parties were unable to reach an accord, the ITU

shareholders sued VCS in Texas seeking monetary damages for breach of contract and a declaration

of their rights under the SPA. When VCS similarly declined to make the second anniversary

payment in full, the ITU shareholders amended their petition, alleging that this failure constituted

an additional breach of the SPA.[5]

In addition to generally denying ITU's allegations, VCS filed a special appearance

contesting personal jurisdiction. Although VCS is a foreign corporation that does not itself directly

provide goods or services to clients in Texas,[6] the ITU Shareholders asserted that jurisdiction was

proper in Texas based on VCS's actual and imputed contacts with Texas. Among other things, the

ITU Shareholders alleged that VCS intentionally directed activities to this forum and derived profits

from Texas residents. In particular, the ITU Shareholders asserted that the SPA was partially

performable in Texas because (1) VCS acquired the stock in ITU to gain access to revenues

from ITU Hong Kong's largest client, Texas-based Dell Computer, Inc. ("Dell"); (2) a large portion

of the revenues on which any performance-based payment would be based originated from ITU Hong

Kong's Texas clients, including Dell; (3) the performance-based payments were expressly contingent

---

[5] While this case was pending in the trial court, VCS initiated a "Consignment Proceeding" in the Court of Concurrent Jurisdiction in Monterrey, Nuevo Leon, Mexico, and tendered to that court at least some of the disputed Infosoft stock certificates. The ITU Shareholders contend, however, that the tender was untimely and insufficient to satisfy the $2.6 million dollars in anniversary payments due under the SPA's terms. VCS maintains that the SPA calls for the tender of a specified number of shares and that VCS tendered the precise number required under the SPA's terms. The current status of the Mexican consignment proceeding is unknown, and the issue of valuation is not before this Court.

[6] The ITU Shareholders contend that VCS effectively provides such services through its subsidiaries, including ITU, but does not allege that VCS itself actually performs any of the work for Texas-based clients.

4

on the continued employment of one of the plaintiffs, Eltschinger, and he was contractually incentivized to retain "top clients", which necessarily included Dell;[7] and (4) the SPA included choice-of-law and mediation provisions requiring the application of Texas law and arbitration rules.[8] In addition, the ITU Shareholders asserted that VCS and its wholly-owned, indirect subsidiary, Softek Integration Systems, Inc. ("SIS"), a Delaware corporation doing business in Texas, should be fused for jurisdictional purposes based on agency principles and on alter-ego and single-business-enterprise corporate-veil-piercing theories. The ITU Shareholders further pointed to a number of other contacts between VCS and Texas, including that VCS and its subsidiaries operate globally under the common trade name "Softek," VCS advertises to the public that "Softek"

---

[7] Although the SPA states that a draft of the terms and conditions of the employment agreements with Eltschinger and other key management employees are an "integral part" of the SPA and are attached to the SPA, there are no such attachments to the SPA that is part of the record in this case. Eltschinger's job offer letter was separately admitted at the special-appearance hearing and was apparently executed contemporaneously with the SPA, but the letter states that it is not an employment agreement. If Eltschinger subsequently executed an employment agreement, that agreement is not part of the appellate record.

[8] The SPA contains two provisions relating to choice of law. The first one, in Article III of the SPA, entitled "Interpretations," states:

> *Applicable Law.* This Agreement shall be construed, interpreted and enforced in accordance with, and the respective rights and obligations of the parties shall be governed by the laws of the state of Texas of the United States of America applicable therein.

The second provision, section 11.04 of the SPA, entitled "Governing Law," states:

> This Agreement is governed by the Laws of the States [sic] of Texas of the United States of America. All contractual disputes between the Parties shall seek settlement of that dispute by mediation in accordance with the Arbitration Rules of the corresponding to Texas [sic] or the appropriate Courts of International Arbitration (LCIA) Mediation Procedure in the United States.

5

does business in Texas and maintains offices in Texas, VCS has licensed the use of "Softek" trademarks to its subsidiaries for use in Texas, VCS used Texas lawyers to represent it in unrelated proceedings before the U.S. Patent and Trademark Office ("USPTO"), VCS's filings with the USPTO stated that VCS has maintained offices in Houston and Austin, and VCS had a single, dormant bank account in Texas.

After an evidentiary hearing on VCS's special appearance, the trial court sustained the special appearance and dismissed the ITU Shareholders' claims with prejudice to refiling in Texas. The trial court subsequently issued findings of fact and conclusions of law, determining that neither specific nor general jurisdiction could be exercised over VCS in Texas.

On appeal to this Court, the ITU Shareholders challenge the trial court's dismissal order on the grounds that (1) a Texas court may properly exercise specific jurisdiction over VCS because there is a substantial connection between VCS's contacts with Texas and the operative facts of the underlying dispute; (2) general jurisdiction exists over VCS because the Texas business VCS directly contracted with the ITU Shareholders to perform in Texas was continuous and systematic; and (3) general jurisdiction exists because VCS's indirect subsidiary, SIS, has extensive contacts with Texas that must be imputed to VCS under agency and corporate-veil-piercing theories. The ITU Shareholders further challenge the legal and factual sufficiency of the evidence to support several of the trial court's fact findings underlying the court's conclusion that neither specific nor general jurisdiction exists.

6

## DISCUSSION

As the plaintiffs, the ITU Shareholders bore the initial burden of pleading sufficient facts to invoke personal jurisdiction over VCS. *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). VCS then assumed the burden of negating all forms of personal jurisdiction alleged, *see id.*, but the ITU Shareholders bore the burden of proving any allegations seeking to pierce the corporate veil. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002). Whether, based on the facts, a court can exercise personal jurisdiction over a nonresident defendant is ultimately a question of law that is reviewed de novo, as are the trial court's underlying legal conclusions. *Moki Mac*, 221 S.W.3d at 574; *BMC Software*, 83 S.W.3d at 794. Subsidiary fact findings, however, are reviewed for legal and factual sufficiency. *BMC Software*, 83 S.W.3d at 794.

In reviewing a legal-sufficiency challenge to the trial court's fact findings, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which an opposing party bears the burden of proof, the challenge must be sustained when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). More than a scintilla of evidence exists to support a finding if the evidence would allow

7

reasonable and fair-minded people to differ in their conclusions. *Id*. Conversely, evidence conclusively establishes a vital fact when the evidence is such that reasonable people could not disagree in their conclusions. *See City of Keller*, 168 S.W.3d at 814-17. When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it has the burden of proof, that party can prevail only if it demonstrates that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

In reviewing a factual-sufficiency challenge, we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When a party attacks the factual sufficiency of an adverse finding as to an issue on which it did not have the burden of proof, we set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When a party attacks the factual sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Urista v. Bed, Bath & Beyond, Inc.*, 245 S.W.3d 591, 601 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Once it is determined that the trial court's findings are supported by sufficient evidence, or if the material facts are undisputed, whether those facts negate all bases for personal jurisdiction is a question of law. *See BMC Software*, 83 S.W.3d at 794.

8

*Personal Jurisdiction*

Texas courts may assert personal jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction comports with federal and state constitutional due-process guarantees. *Moki Mac*, 221 S.W.3d at 574. Our long-arm statute contains broad language allowing the exercise of jurisdiction over a nonresident who "does business in this state." Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 2008); *see also id.* § 17.043 (West 2008) (concerning service of process in actions arising from nonresident's business in Texas). The Texas Supreme Court has construed the statute's doing-business language to "'reach as far as the federal constitutional requirements of due process will allow.'" *Moki Mac*, 221 S.W.3d at 575 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)).

Applying federal due-process principles, it is well settled that personal jurisdiction is proper in Texas only if the nonresident defendant has established minimum contacts with this state and the exercise of jurisdiction over the defendant comports with "'traditional notions of fair play and substantial justice.'" *Id.* (quoting *International Shoe v. Washington*, 326 U.S. 310, 316 (1945)). The minimum-contacts requirement will be satisfied in this case if VCS has "'purposefully avail[ed] itself of the privilege of conducting activities within [Texas], thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The hallmark of the "purposeful availment" inquiry is foreseeability that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see American Type Culture*

9

*Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) ("The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court."). Under this standard, a nonresident defendant must have "fair warning that a particular activity may subject [the defendant] to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quotations omitted). The foreseeability requirement ensures "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id*.

As delineated in *Michiana Easy Livin' Country, Inc. v. Holten,* a triad of limitations circumscribes the "purposeful availment" inquiry: (1) we may only consider VCS's contacts with Texas and not the unilateral activity of another party or a third person; (2) the relevant contacts "must be purposeful rather than random, fortuitous, or attenuated"; and (3) VCS must have sought "some benefit, advantage or profit by 'availing' itself of [this] jurisdiction." 168 S.W.3d 784-85 (Tex. 2005); *see also Moki Mac*, 221 S.W.3d at 575.

If minimum contacts with the forum state are established, those contacts may give rise to two types of personal jurisdiction—specific jurisdiction and general jurisdiction. Specific jurisdiction exists if the defendant's alleged liability "'aris[es] out of or [is] related to'" the defendant's forum-state contacts. *Moki Mac*, 221 S.W.3d at 575 (alterations in original). If the defendant's contacts are continuous and systematic, general jurisdiction is established regardless of whether the defendant's alleged liability arises from those contacts. *Id*. The ITU Shareholders contend that both specific and general jurisdiction are established in this case.

10

*Specific Jurisdiction*

The ITU Shareholders assert a number of contacts between VCS and Texas that allegedly give rise to personal jurisdiction over VCS. However, the only contacts with Texas that the shareholders contend confer specific jurisdiction in this case are those that originate by and through the SPA. Therefore, our specific-jurisdiction analysis focuses exclusively on whether the SPA and the relationship it created and governs constitute minimum contacts with Texas and whether the operative facts of the underlying litigation arise from or are related to those contacts.

The ITU Shareholders assert that VCS established minimum contacts with Texas by acquiring ITU and ITU Hong Kong, which at the time of acquisition derived a significant portion of its revenues from providing IT outsourcing services to Texas-based clients. According to the ITU Shareholders, VCS purposefully availed itself of the privilege of conducting activities in Texas and *directly* conducts business in Texas because it executed the SPA for the purpose of acquiring ITU Hong Kong's Texas business contacts. The shareholders note that the SPA contains a Texas choice-of-law provision and that VCS expressly conditioned its purchase of ITU's stock at the stated contract price on (1) the continued employment of Eltschinger, who in turn was offered a bonus for retaining "top clients" (which necessarily included Texas-based Dell), and other "key management,"[9] and (2) ITU's achieving an expected degree of profitability, which effectively required ITU (through the China subsidiary) and its key management to continue generating business in Texas and maintaining "strategic partnerships" in Texas. For this reason, the ITU Shareholders challenge both

---

[9] The ITU Shareholders make claims about the terms of employment of all of the unidentified "key management" but focus on Eltschinger specifically and offered only his job-offer letter at the hearing on VCS's special appearance.

the trial court's conclusion that personal jurisdiction is lacking and the legal and factual sufficiency of the evidence to support the district court's findings that (1) VCS "does not directly do business in the state of Texas or with persons or entities located in Texas"; (2) VCS "does not provide outsourcing services to persons or entities in Texas"; and (3) "[t]he evidence before the court did not prove that Defendant [VCS] maintained strategic partnerships with persons and entities located in Texas."

In support of their argument, the ITU Shareholders cite evidence that is undisputed or conclusively establishes that at the time the SPA was executed VCS knew that (1) a significant source of ITU's revenue was generated from Texas-based clients; (2) ITU's China-based subsidiary had a contractual arrangement with a Texas-based company, Intersys Consulting, Inc. ("Intersys"), which acted as an intermediary between that subsidiary and Texas-based customers, including Dell, Hewlett Packard, and Advanced Micro Devices; (3) retention of ITU Hong Kong's "top clients" would necessitate doing work for Texas-based Dell, including regular calls, emails, and physical visits to Texas by Eltschinger; and (4) the SPA's performance-based payment provisions (part of the acquisition price) would likely be applied to revenues generated in part from customers in Texas.

In addition, following VCS's acquisition of ITU, VCS's U.S.-based indirect subsidiary, SIS, entered into a "Teaming Agreement" with Intersys with the stated purpose of transitioning SIS into the position of providing services directly to Dell. The ITU Shareholders characterize this transaction as VCS "transfer[ring] ITU's most valuable asset—its business relationship with Dell—to SIS." This, the ITU Shareholders contend, shows that the SPA was actually a contract to purchase ITU/ITU Hong Kong's business relationship with Dell and

12

other Texas companies by allowing VCS's indirect subsidiary to assume a strategic partnership with Intersys.

In sum, the shareholders contend that the SPA was effectively a contract for the performance of work in Texas (at least in part); consequently, they assert that the post-acquisition entity's contacts with Texas are effectively VCS's contacts and that any claims concerning performance of the SPA arise out of or relate to VCS's Texas contacts. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1) (specifying contracts to be performed in whole or in part in this state as coming within long-arm statute's ambit). More particularly, they contend that the dispute in this case arises out of and relates to VCS's Texas contacts (i.e., the SPA) because VCS invoked the performance-based payment provisions in declining to make the anniversary payments and because the performance-based payment provisions rely on EBITDA results, which include revenues from work the post-acquisition ITU entity performed for Texas-based clients.[10]

VCS contends that ITU and ITU Hong Kong's post-acquisition activities in Texas cannot be imputed to VCS based on the SPA because that contract was solely for the purchase of stock and neither specified nor required any activities to be conducted in Texas. In addition, VCS asserts that specific jurisdiction does not obtain in this case even if the SPA otherwise constitutes a forum-state contact, because there is no substantial connection between the alleged breach of the

---

[10] It is undisputed that no performance-based payment is due and, therefore, the actual Texas-based revenues play no part in the disposition of the shareholders' claims against VCS. Moreover, VCS has expressly disavowed any intent to claim—at least in this litigation—that the performance-based-payment provisions can be offset against the anniversary payments due and payable under the SPA. Although VCS's appellate briefing characterizes the performance-based-payment provisions as "optional," we understand its argument to be that the payments were "conditional" and were not due unless positive EBITDA results obtained.

13

anniversary-payment provisions and the provisions in the SPA that tangentially involve ITU's future performance, including anticipated performance in Texas. With regard to the impact of the "Teaming Agreement" between Intersys and SIS, VCS contends that the "Teaming Agreement" establishes only an intent to phase Intersys out as an intermediary and further points out that there is no evidence that ITU/ITU Hong Kong was ever replaced or denied the benefit of its work for either Intersys or Dell. In addition, VCS notes the absence of evidence or allegation that it was involved in the execution of the Teaming Agreement or any decisions regarding the relationship among ITU, Intersys, and Dell.

We agree with VCS that the ITU Shareholders improperly focus on ITU's contacts with Texas rather than VCS's contacts with Texas. In effect, the ITU Shareholders are attempting to impute ITU's contacts to VCS, but they provide neither argument nor evidence that the corporate veil between the two should be pierced. In conducting a minimum-contacts analysis, we may only consider VCS's contacts with Texas and not the unilateral activity of another party or a third person. *Moki Mac*, 221 S.W.3d at 575.

In addition, a contract—even one with a forum-state resident—does not alone constitute a sufficient "contact" for due process purposes. *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597-98 (Tex. 2007). Rather, in determining whether a contract between two parties constitutes a forum-state contact, we must evaluate the prior negotiations and contemplated future consequences of the contract, along with the terms of the contract and the parties' actual course of dealing. *Burger King Corp.*, 471 U.S. at 479. Considering these factors in this case, the evidence does not support the conclusion that VCS purposefully established minimum contacts with Texas.

14

It is undisputed or conclusively established that (1) the parties to the SPA are foreign corporations with principal places of business outside the United States; (2) the SPA was executed and the purchase transaction was closed in Monterrey, Nuevo Leon, Mexico; (3) the SPA was for the purchase of all outstanding shares of ITU stock, not the provision of goods or services between VCS and ITU; (4) the SPA does not specify the performance of any activities in Texas; (5) the SPA does not contain a forum-selection clause but does assign Texas law as the law governing disputes; (6) the SPA does not specify the location of the stock-purchase payments; (7) none of ITU's "key management" is a Texas resident; (8) none of ITU's "key management" is employed or maintains an office in Texas; (9) following acquisition of ITU and the China subsidiary, Eltschinger was employed as "CEO Softek IT United" in Asia and was not employed to work directly for VCS; and (10) VCS did not directly provide any services to Dell or other Texas-based clients. There is neither evidence nor allegation that any of the SPA or employment-contract negotiations took place in Texas—either in person or through communications directed at Texas. Similarly, there is neither evidence nor allegation that VCS engaged in communications, negotiations, or subsequent business dealings with Texas residents in order to execute or perform the SPA. Nor is there evidence or allegation that VCS is a signatory to the employment agreements of Eltschinger or other key management. And, although choice-of-law provisions are relevant to the purposeful-availment analysis, they are not dispositive in determining whether a defendant has purposefully availed itself of the benefits and protections of a state's laws. *Id*. at 482 ("such a provision alone would be insufficient to confer jurisdiction" but taken with other factors might "reinforce[] his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there");

15

*Michiana*, 168 S.W.3d at 792 (noting that choice-of-law and forum-selection provisions are relevant to purposeful-availment inquiry); *see also Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 125 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.) (choice-of-law provision standing alone does not "indicate a voluntary submission to the personal jurisdiction of the state's courts in the absence of an express understanding to that effect"). On this record, we cannot say that the trial court erred in determining that VCS did not purposefully avail itself of the privilege of conducting activities within the State of Texas. Nor can we say that the trial court's disputed fact findings are without sufficient evidentiary support.

There is no evidence contrary to the trial court's fact finding that the SPA was for the purchase of stock in a foreign corporation by a foreign corporation. The provisions in the SPA that the shareholders attempt to tie to the business in Texas do nothing more than operate as price-adjustment mechanisms for the value of the stock and cannot properly be construed as making revenues arising from business in Texas the subject matter of the contract.[11] The execution of the

---

[11] Furthermore, the contacts with Texas that the ITU Shareholders rely on appear more attenuated than purposeful. The fact that the SPA's performance-based payments are conditioned on future financial performance might imply an expectation that business will be obtained from the existing clients, but does not actually require such a result or require that such result be obtained by doing business in Texas. Under the terms of the SPA, ITU's performance or nonperformance in Texas affected, at most, only the acquisition price VCS would be required to pay. Likewise, although Eltschinger's employment agreement, which is ancillary to the SPA, may provide financial incentives for retaining existing business, the agreement does not explicitly or implicitly *require* any performance in Texas, nor does it condition Eltschinger's continued employment on maintaining existing business relationships; it merely provides a reward to him if he does. It is not even clear on this record what essential terms and conditions of Eltschinger's employment were "integral" to the SPA. Although the SPA states that "[s]igned draft[s] of the terms and conditions of such of [sic] employment agreements with Key Management" are attached and are "an integral part" of the agreement, no draft terms and conditions were included with the SPA admitted into evidence.

16

SPA does not give rise to minimum contacts with Texas, nor are ITU's post-acquisition business activities in Texas attributable to VCS merely because the purchase price of the stock was conditioned on the actual value of the company meeting the company's expected value. While it may be true that VCS purchased the shares of stock in ITU with the expectation of deriving a profit from the acquisition, including some profits derived from the subsidiary's work in Texas, there would rarely be a case in which a shareholder did not acquire an interest in a corporation without hoping to achieve some financial or other benefit from the acquisition. We cannot conceive that such motivation, even if "secured" by financial incentives in the purchase agreement, could satisfy the minimum contacts standard on the record in this case. *See GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 869 (Tex. App.—Austin 2008, no pet.) ("The bare fact that a defendant receives some benefit, advantage, or profit from Texas does not necessarily mean that it has purposefully availed itself of the state." (citing *Michiana*, 168 S.W.3d at 788)). Taken to its logical extreme, the ITU Shareholders' position in this case would result in virtually a per se rule imputing a corporation's forum-state contacts to a parent company or other shareholders. Such a result is inconsistent with personal-jurisdiction jurisprudence. *See, e.g.*, *Commonwealth Gen. Corp. v. York*, 177 S.W.3d 923, 925 (Tex. 2005) ("Stock ownership and the related right of control that stock ownership gives to stockholders are insufficient to destroy the distinctness of corporate entities for jurisdictional purposes."); *Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 481 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("In general, a corporation is a separate legal entity that shields its owners and shareholders from the jurisdiction of a foreign jurisdiction, even if the corporation itself is within the court's jurisdiction.").

17

The ITU Shareholders rely on *Zac Smith & Co., Inc. v. Otis Elevator Co.*, 734 S.W.2d 662 (Tex. 1987), for the proposition that VCS could establish minimum contacts via a contract without actually coming to Texas. *Zac Smith* is distinguishable, however, because the defendant in that case signed a joint-venture agreement for the purpose of building a hotel in Texas. *Id.* at 665-66. The contract was wholly performable in Texas, and the parties anticipated a profit from the construction of the hotel in Texas. *Id.* These actions were directed toward Texas residents, and negotiations for the construction of the hotel were directed toward Texas. *Id.* The facts in *Zac Smith* are markedly dissimilar from the facts of the present case. Other cases the shareholders rely on are similarly distinguishable. *See KMG Kanal-Muller-Gruppe Deutschland GMBH & Co. KG v. Davis*, 175 S.W.3d 379, 389 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (specific jurisdiction existed in employment-contract dispute based on defendant's technology licensing contract executed in Texas with Texas-based company that employed plaintiff, contract required performance in Texas, and defendant's managing director negotiated Texas plaintiff's employment contract); *Intercarga, S.A. v. Fritz Cos., Inc.*, No. 14-02-00297-CV, 2003 WL 21402583, at \*7 (Tex. App.—Houston [14th Dist.] June 19, 2003, no pet.) (not designated for publication) (concluding that significant aspects of contract negotiations occurred in Texas and transactions involved contracts for transportation of goods from Texas to Ecuador); *Santy v. McElroy*, No. 03-00-00368-CV, 2001 WL 838400, at \*6 (Tex. App.—Austin July 26, 2001, no pet.)(not designated for publication) (concluding that specific jurisdiction existed based on defendants' numerous ties to Texas regarding Texas real estate transactions from which defendants directly profited).

18

Having considered the terms of the SPA, the nature of the relationship among VCS, ITU, and Texas, the pleadings, and the evidence in the record, we hold that the trial court did not err in determining that VCS did not purposefully direct sufficient actions at Texas in connection with purchasing the stock in ITU to give rise to specific jurisdiction over disputes arising out of the performance of the SPA. Furthermore, because there is no legal or factual basis for imputing ITU's or the China subsidiary's post-acquisition contacts to VCS, the trial court's challenged fact findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Because we conclude that the alleged contacts giving rise to specific jurisdiction do not satisfy minimum-contacts requirements, we need not consider whether the shareholders' claims in this lawsuit arise from or are related to those contacts.

### General Jurisdiction

General jurisdiction may be exercised over a nonresident defendant with continuous and systematic contacts with this state, without regard to whether the defendant's alleged liability arises from those contacts. *Guardian Royal Exch.*, 815 S.W.2d at 228. All contacts made up to the time suit is filed are relevant to the general-jurisdiction inquiry. *American Type Culture*, 83 S.W.3d at 804. For general-jurisdiction purposes, we do not view each contact in isolation. All contacts must be carefully analyzed for proof of a pattern of continuing and systematic activity. *Id.* at 809. We are not concerned with the quantity of contacts but rather the quality of contacts. *Id.* at 809-10. What constitutes continuous and systematic contacts can only be decided on a case-by-case basis. *Id.* at 810.

In support of their general-jurisdiction argument before the trial court, the ITU Shareholders cited three categories of "continuous and systematic" contacts by VCS with Texas: (1) ITU/ITU Hong Kong's post-acquisition contacts with Texas, imputed to VCS by virtue of the SPA; (2) SIS's contacts with Texas, imputed to VCS via agency and corporate-veil-piercing theories; and (3) VCS's own contacts with Texas. On appeal, the ITU Shareholders have abandoned their pursuit of general jurisdiction based on VCS's own contacts with Texas. Therefore, only the first and second categories of contacts are at issue on appeal. We have already declined to impute ITU/ITU Hong Kong's post-acquisition contacts with Texas to VCS based on the SPA; consequently, we hold that those contacts do not give rise to general jurisdiction over VCS, even if the post-acquisition contacts of ITU/ITU Hong Kong are continuous and systematic, as the ITU shareholders allege.[12]

The remaining category of contacts upon which general jurisdiction is alleged are those made by VCS's indirect U.S. subsidiary, SIS, which the ITU Shareholders allege are attributable to VCS based on agency principles and corporate-veil-piercing theories. It is undisputed that SIS does business in Texas, and the Shareholders contend that the manner in which VCS operates the "Softtek family of businesses" demonstrates a greater-than-normal amount of control by a parent of its subsidiaries and "a constant collapsing of the distinctions between the entities." The ITU Shareholders therefore challenge the legal and factual sufficiency of the evidence to support

---

[12] The ITU Shareholders devote little attention to this theory in their appellate briefing save for the following conclusory statements in the "Summary of the Argument" portion of the brief: "The Texas business that VCS itself—not any of its subsidiaries—contracted for [the ITU Shareholders] to perform was both continuous and systematic. Thus Texas could properly exercise general jurisdiction over VCS based on VCS's own conduct."

20

some of the trial court's findings of fact relating to VCS's and SIS's separateness and observance of corporate formalities and related conclusions of law.

### 1. Agency Relationship between SIS and VCS

The ITU Shareholders contend that SIS has acted as VCS's agent in Texas, and as a result, SIS's contacts with Texas are effectively VCS's contacts. The shareholders do not specify whether they are alleging that SIS had actual authority or apparent authority to act on VCS's behalf, but because there is no evidence of actual authority, we confine our discussion to whether SIS possessed apparent authority to act on VCS's behalf. Apparent authority arises through the principal's acts of participation, knowledge, or acquiescence that "'clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise.'" *Gaines v. Kelly*, 235 S.W.3d 179, 183 (Tex. 2007) (quoting *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998)) (alteration in original). Apparent authority is based on the acts of the principal and is limited to the scope of authority that is apparently authorized, viewed from the perspective of a reasonably prudent person using diligence and discretion to ascertain the agent's authority. *Id.* Under Texas law, agency is not presumed, and the party who alleges agency has the burden of proving it. *IRA Res.*, 221 S.W.3d at 597.

In support of their agency argument, the ITU Shareholders principally cite the actions of Beni Lopez, SIS's Chief Executive Officer, on behalf of VCS in negotiating certain aspects of the SPA—including signing the Letter of Intent for the acquisition of ITU's shares as VCS's authorized representative —and conducting related due diligence. They also point out that Lopez listed his title on the Letter of Intent, and other documents, as "U.S. Chief Executive Officer." The ITU

21

Shareholders also cite evidence that Lopez "deliver[ed] the news to Mr. Eltschinger that his employment was being terminated and announc[ed] the decision to the ITU management team." They further rely on Lopez's involvement in attempting to resolve the dispute in this case, including VCS's admission that in October 2009 Lopez authored a letter on VCS letterhead to Eltschinger and Schlais stating "Softek's" position on settlement.

The shareholders also reference other circumstances they contend blur the lines between SIS and VCS. Specifically, they cite to undisputed evidence that VCS and its subsidiaries operate under the umbrella of the single trade name, "Softek," and market the Softek corporate family's combined resources and capabilities under that umbrella without distinguishing among the various corporate entities in their marketing materials. They contend that using the trade name created confusion both inside and outside of VCS and its subsidiaries as to which entity was being referenced. Among other things, they cite testimony from J.R. Carter, Intersys's corporate representative, that he did not know there was a difference between "Softek" and SIS and thought SIS was just the legal name for "Softek." Finally, they point to language in SIS's "Teaming Agreement" with Intersys, which defines "Softek" as SIS for purposes of that contract but which also contains factually incorrect statements that ITU and ITU Hong Kong are "Softek's" wholly-owned subsidiaries.

The evidence the ITU Shareholders rely on fails to meet the standard for apparent agency. Although Lopez is not an officer of VCS, he is a member of VCS's board of directors and in that role could be authorized to act on behalf of VCS. Admittedly, Lopez's references to himself as "U.S. Chief Executive Officer"—a position that does not exist in VCS's corporate hierarchy—are

22

confusing, but given Lopez's role as a VCS director, the trial court could reasonably have concluded that Lopez was acting in that capacity rather than on behalf of SIS as VCS's agent. There is sufficient evidence to support a finding that a reasonably prudent person, using diligence and discretion to ascertain the agent's authority, would not have considered Lopez to be acting for SIS, a nonsignatory to the SPA, rather than in his capacity as a VCS director.

With regard to SIS's use of marketing materials under the "Softek" trademark, it is unclear what aspect of the marketing materials in the record would create the impression that any of the Softek entities had agency authority to act on behalf of VCS, let alone that SIS in particular had such authority. While it is true that the use of a common trade name could, in some circumstances, create the impression of a single company, both Eltschinger and J.R. Carter testified that it is not uncommon for there to be global brand marketing of related corporations without distinguishing the separateness of each legal entity in the corporate family. In fact, Eltschinger testified that ITU operated in a similar manner pre-acquisition. Given the sophisticated nature of the services that SIS offers its customers, a reasonably prudent person exercising diligence could have discovered which Softek entity it was dealing with, and there is sufficient evidence to support the trial court's finding that SIS "often refers to itself by the trade name 'Softek,' but specifies its proper corporate name in all contracts and legal documents." A mere misstatement of fact in the Teaming Agreement does not alter this conclusion, especially in the absence of evidence that the misstatement was material in any respect to the parties' agreement. Although the ITU shareholders contend that Intersys thought it was dealing with VCS—"the mothership"— in making the Teaming Agreement, J.R. Carter actually testified that he believed that SIS was ITU's and ITU Hong Kong's parent

23

company, not that SIS was acting on VCS's behalf; moreover, there is no indication that Carter conducted any inquiry regarding Softek's corporate structure or that it was germane to Intersys's transactions with SIS.

In sum, the ITU Shareholders did not conclusively establish that SIS acted as VCS's agent, nor is the trial court's implied finding to the contrary against the great weight and preponderance of the evidence.

### 2. Single-Business Enterprise or Alter Ego

A parent company and its subsidiary may be "fused" for jurisdictional purposes if the plaintiff proves that "the parent controls the internal business operations and affairs of the subsidiary." *BMC Software*, 83 S.W.3d at 799. "But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." *Id.* A parent company cannot be subjected to personal jurisdiction based on the local activities of its subsidiary when "the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent and is not acting as merely one of its departments . . . ." 4A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1069.4 (3d ed. 2002). "[T]he party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities [must] prove this allegation, because Texas law presumes that two separate corporations are distinct entities." *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007).

The ITU Shareholders cite thirteen factors they claim must be considered in determining whether VCS and SIS operate as a single-business enterprise. Although the Texas Supreme Court rejected the single-business-enterprise theory of *liability* in *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 456 (Tex. 2008), the ITU Shareholders contend that the theory remains viable for *jurisdictional* veil-piercing purposes. We disagree. Although courts have acknowledged that jurisdictional veil-piercing and substantive veil-piercing involve different elements of proof, *see PHC–Minden*, 235 S.W.3d at 174; *Daimler–Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 721 n.5 (Tex. App.—Austin 2000, pet. dism'd w.o.j.), the theory of single-business enterprise as a basis for personal jurisdiction has never been endorsed or embraced by the supreme court. *See PHC–Minden*, 235 S.W.3d at 173-74. Moreover, even before the theory was expressly repudiated in *Gladstrong*, the supreme court had indicated that a more stringent standard should be applied in the context of jurisdictional veil-piercing, stating that personal jurisdiction involves due-process considerations that may not be overridden by statute or common law. *Id*.

In that regard, rather than applying the single-business-enterprise factors the ITU Shareholders cite, the Texas Supreme Court has relied on the following factors in determining whether a subsidiary is "separate and distinct from its parent corporation for personal jurisdiction purposes": (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters; (3) the observance of corporate formalities; and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *Id.* at 175 (citing 4A Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1069.4). Ultimately, the evidence must

25

establish that the two entities are not factually and legally separate and the corporate veil should therefore be pierced to prevent fraud or injustice. *BMC Software*, 83 S.W.3d at 799.

Parent companies normally exercise at least some control over their subsidiaries, and "[a] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975). The Texas Supreme Court has held that "'[a]ppropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies.'" *PHC–Minden*, 235 S.W.3d at 176 (quoting 16 Moore's Federal Practice § 108.42[3][b]). To pierce the corporate veil in the personal-jurisdiction context, there must be "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Id.* (quoting *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999)).

The ITU Shareholders contest the following portions of the trial court's fact findings relevant to corporate separateness between VCS and SIS:

5.     [VCS] does not operate its subsidiaries as a mere alter ego or single business enterprise. [VCS] exercises the appropriate level of control incident with its ownership, but does not control the day-to-day-operations of its subsidiaries.

. . . .

14.     . . . [SIS] specifies its proper corporate name in all contracts and legal documents.

. . . .

26

18. [VCS] and its subsidiary [SIS] observe all necessary legal formalities and . . . operate as distinct legal entities. They maintain separate personnel, independent boards of directors (with a few, but not all, common members) . . . .

19. While [SIS is] a wholly-owned indirect subsidiary of [VCS], it is a separate, self-sufficient corporate entity. . . .

20. In their business transactions with each other, [VCS] and its subsidiary [SIS] utilize written contracts, provide invoices to each other and document amounts paid and outstanding balances. The contracts included reasonable commercial terms, and there was no evidence that the transactions were designed to systematically benefit one entity over the other.

Some of the challenged fact findings are better characterized as conclusions of law, and we will review those portions accordingly. *See Ray v. Farmers' State Bank*, 576 S.W.2d 607, 608 n.1 (Tex. 1979) (trial court's labels not controlling). The shareholders also challenge the trial court's conclusion "that VCS and SIS are distinct corporate entities, and there is no basis for disregarding either corporate entity."

The ITU Shareholders rely on much of the same evidence they cite in support of their agency theory—Lopez's actions (including inconsistent or inaccurate use of his organizational title), common use of the "Softek" trade name by VCS's subsidiaries when soliciting and conducting business, and the erroneous factual recitation in the Teaming Agreement—along with evidence of inter-company loans between VCS and its subsidiaries and vice-versa (some of which may be interest free), overlapping directors, and invoicing of customers originating from subsidiaries that did not provide services to that customer. The ITU shareholders also contend that VCS "assigned" the Intersys relationship to SIS without any evidence that SIS provided consideration for the acquisition, further demonstrating VCS's control over the operations of its subsidiaries.

27

We conclude that there is sufficient evidence to support the trial court's findings that VCS and SIS observe legal formalities, have separate personnel, and have independent boards of directors. Pertinent to the general-jurisdiction analysis are the following unchallenged fact findings:

6. The trademarks and trade names [VCS owns] are used in the state of Texas by [SIS] pursuant to a contractual licensing agreement. They are not directly used in Texas by [VCS], although its subsidiaries sometimes use materials bearing a copyright notice from [VCS] in their activities in Texas.

. . . .

11. [VCS] and its subsidiaries frequently marketed and represented to the public the global trade name "Softek," describing the locations and activities of all the companies worldwide under the single trade name or brand "Softtek." In doing so, both [VCS] and its subsidiary [SIS] represented to the public that "Softek" had offices and operations in the state of Texas.

. . . .

18. . . . [VCS and SIS] maintain separate and distinct accounting records. Independent auditors prepared annual audits describing the financial interactions between the companies, which were apparently documented to the satisfaction of the auditors. The companies also filed separate tax returns.

19. . . . [SIS] hires and fires its own employees and employs a workforce of hundreds. It has its own business departments, such as human resources and accounting, and its own management team. [SIS] is responsible for maintaining its own financial records, and the employees and officers of [VCS] did not have authority to transfer funds of [SIS] or make or alter entries in its financial records.

With regard to the impact of the "Teaming Agreement" between Intersys and SIS, the shareholders correctly observe that the record is devoid of evidence regarding consideration for SIS's assuming ITU's or ITU Hong Kong's role in the relationship with Intersys, but the shareholders bore the burden of establishing the absence of consideration. *See BMC Software Belgium*, 83 S.W.3d at

28

798 (plaintiff bears burden of proving any allegations seeking to pierce corporate veil). Moreover, there is no evidence that ITU/ITU Hong Kong was ever replaced or denied the benefit of its relationship with Intersys or that VCS directed or participated in the negotiations among Intersys, SIS, and ITU/ITU Hong Kong. Indeed, per VCS, the Teaming Agreement reflects only an intent to phase Intersys out as an intermediary, and there is no evidence to the contrary. Finally, the Teaming Agreement's misstatement of organizational affiliation between SIS and ITU/ITU Hong Kong does not contradict the trial court's finding that SIS specifies its *proper corporate name* in all contracts and legal documents, despite the shareholders' argument to the contrary.

Although the ITU shareholders make much of the fact that VCS's subsidiaries operate under the Softek trade name and market themselves as having a collective global presence, the jurisdictional significance of this fact is diminished by the absence of any evidence that SIS acts to any degree as a conduit for VCS's goods or services or that VCS conducts significant business functions by or through SIS. *Cf. Daimler-Benz Aktiengesellschaft*, 21 S.W.3d at 720-25 (parent established U.S. subsidiary through whom it sold its products to customers in U.S., licensed its distinctive trademark to subsidiary which created confusion of identity, and closely supervised and directed subsidiaries' activities); *Mayo Clinic v. Jackson*, No. 05-98-00225-CV, 1998 WL 699385, at *4 (Tex. App.—Dallas Oct. 9, 1998, no pet.) (not designated for publication) (among other contacts, related entities were using similar trademark as non-resident defendant and were clearly soliciting business for non-resident defendant to provide medical services directly to Texas residents).

There is undisputed evidence of loans of varying amounts and frequencies between VCS and its subsidiaries, including SIS, but the evidence is uncontroverted that the loans were properly documented; there is no evidence that the debts were not paid; the loans went both ways and do not evidence that either entity was consistently undercapitalized; and there is evidence that the subsidiaries can and have refused requests for inter-company loans. While there is some indication that at least some loans may have been interest free, the evidence does not greatly preponderate against the trial court's factual determinations that SIS and VCS used written contracts to document their business transactions with each other, the contracts included reasonable commercial terms, and the transactions were not designed to systematically benefit one entity over the other. The same can be said of the evidence regarding the subsidiaries' invoicing practices. First, there is no evidence that any subsidiaries invoiced other companies on VCS's behalf or vice versa. Second, there is no evidence that the subsidiaries did not have contractual arrangements to provide such invoicing or secure payment for services rendered.

In *BMC Software*, the supreme court held that a parent and subsidiary could not be "fused" for jurisdictional purposes, even though there was duplication of officers and directors, the parent referred to its subsidiaries in an annual report, the parent loaned money to the subsidiary to hedge funds against currency fluctuations, and the parent and subsidiary used the same letterhead with the "BMC Software" trade name. 83 S.W.3d at 799-800. Likewise, it has been held that the forum contacts of a subsidiary could not be imputed to a parent when the subsidiary (1) had its own staff, payroll, accounting department, auditors, and attorneys, (2) kept separate accounting records and bank accounts, (3) filed separate consolidated tax returns, (4) was managed by a separate board

30

of directors, even if some of its members also served on the board of directors of the parent, and (5) was centrally managed by the parent company but had its own offices. *Gibraltar Sav. v. LD Brinkman Corp.*, 860 F.2d 1275, 1291 (5th Cir. 1988).

Like these cases, there is no conclusive evidence to support the ITU shareholders' theory that VCS and SIS were not factually or legally independent of one another or that VCS controlled the internal business operations of SIS and thereby became SIS's alter ego. To the contrary, there is ample evidence that the entities observed legal formalities and operated as separate entities. Based on the evidence admitted at the special-appearance hearing, we also conclude that the trial court's disputed fact findings are not against the great weight and preponderance of the evidence.

For the foregoing reasons, we conclude that the trial court correctly determined that there is no basis for exercising general jurisdiction over VCS either by piercing the corporate veil or by applying agency principles.

## CONCLUSION

The record contains sufficient evidence to support the trial court's conclusion that VCS lacked sufficient minimum contacts with Texas and is therefore not amenable to personal jurisdiction in this State. The court's judgment dismissing the case against VCS for lack of personal jurisdiction is affirmed.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: April 25, 2012

32